UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

JOSEPH YERUSHALMI,

        Debtor.
-----------------------------------------------------------------x
MARC A. PERGAMENT, Chapter 7 Trustee of
Trustee of the Estate of JOSEPH YERUSHALMI,

        Plaintiff,

vs.

MALKA YERUSHALMI, JOSEPH YERUSHALMI
 and MALKA YERUSHALMI as Trustees for
September 7, 1995 Qualified Personal Residence Trust,

        Defendants.
-----------------------------------------------------------------x

Case No. 807-72816-reg

Chapter 7

Adv. Proc. No. 809-8003-reg

## <u>MEMORANDUM DECISION</u>
### (Re: Defendants' Motions for Summary Judgment)

   Before the Court are the Defendants' motions for summary judgment pursuant to Fed. R.

Civ. P. 56(c), and Fed. R. Bankr. P. 7056.  The chapter 7 trustee has filed this adversary

proceeding seeking a declaratory judgment under sections 541 and 542 of the Bankruptcy Code.

He claims that a qualified personal residence trust established by the Debtor to hold real property

is by law the alter ego of the Debtor and consequently the property held by the trust is property of

the estate which must be turned over for the benefit of all creditors of the estate.  The Defendants

argue, in part, that judgment should be entered in their favor in that the chapter 7 trustee lacks

standing to bring the alter ego claim because as a matter of law that claim belongs to creditors

not to the Debtor and its estate.

The material facts are not in dispute and this case is ripe for summary judgment. As a threshold matter the Court finds that as a matter of law a chapter 7 trustee is the only person with standing to pursue alter ego claims on behalf of a bankruptcy estate pursuant to section 541 of the Bankruptcy Code, as long as the claim could have been asserted by the debtor pre-petition and the claim involves a generalized injury which is not particular to one creditor. In this case, the Court finds that the Debtor could have asserted the alter ego claim pre-petition against the trust, and the claim, if asserted by a creditor, did not involve an injury which was specific to any particular creditor. The Court also finds that because this claim is asserted under section 541 of the Code and as such is an action to recover property of the estate, it is not subject to the statute of limitations applicable to fraud actions. However, on the merits, the Court finds that the Trustee has failed to satisfy his burden to prove that the Debtor exercised the requisite dominion and control over the trust necessary to sustain an alter ego finding; nor has he proven the fraud or wrongdoing necessary to support the piercing claim.

For this reason and for the reasons more fully set forth in this Memorandum Decision, the Defendants' motions are granted, and judgment will enter in favor of the Defendants on the sole remaining cause of action of the amended complaint.

### Facts

*The Great Neck Residence*

The Debtor, Joseph Yerushalmi, and the Defendant, Malka Yerushalmi, were married in 1971. In 1983, they purchased a single family home located on West Shore Road in Great Neck,

New York ("Great Neck Residence"), which served as their marital residence.[1]  The Great Neck

Residence was purchased for $410,000, of which the Yerushalmis paid $210,000 in cash and the

balance was financed by a private mortgage of $200,000.[2]  The $210,000 cash payment came

from the proceeds of the sale of the Yerushalmis' former marital residence which was purchased

in 1977.

In 1989, the Yerushalmis borrowed over $1 million from Citibank secured by a first and

second mortgage in order to renovate the Great Neck Residence to fit the needs of their family,

including their youngest son who had special needs.  In January of 2003, the Yerushalmis caused

a consolidation of all mortgages encumbering the Great Neck Residence - which then totaled

$515,600 - at a more favorable interest rate.  The parties do not dispute that the Yerushalmis did

not take any equity out of the property at the re-finance.  As of the date of the bankruptcy filing

there was approximately $4.8 million of equity in the Great Neck Residence.

*The Qualified Personal Residence Trust*

In or around 1989, the Debtor began implementing estate planning strategies.  On July 26,

1989, the Debtor executed a trust document called the July 31, 1989 Yerushalmi Family Trust.

The beneficiaries of the Yerushalmi Family Trust are the Yerushalmis' children, and the trustee,

a family friend.  In addition, in 1995, an irrevocable qualified personal residence trust ("QPRT")

was created in order to facilitate the ultimate transfer of the Great Neck Residence into the

---

[1]    The Trustee admits that the Great Neck Residence was purchased by the Yerushalmis as husband and wife, but denies that they have continuously used it as their marital residence. This dispute of fact is not material to this analysis.

[2]    According to the Debtor, this private mortgage was satisfied sometime in 1987.

Yerushalmi Family Trust with a reduced gift and estate tax consequence to the Yerushalmis' children.[3]  Malka and the Debtor are co-trustees of the QPRT, but neither is a beneficiary.

It is this Court's understanding that an individual – a grantor – might transfer real property to a QPRT in order to reduce the size of their taxable estate.  (Decl. of Gary M. Kushner ("Kushner Decl."), Exh. 43 [Dkt #83-46]).  If structured properly, the QPRT will freeze the value of the grantor's residence at the time he or she creates the trust and result in estate tax savings if the property increases in value.  During the term of the QPRT, the grantor retains the exclusive rent-free use, possession and enjoyment of the residence and pays all ordinary and recurring expenses such as real estate taxes, insurance and minor repairs.  At the expiration of the trust term the grantor must relinquish possession of the residence or pay rent to the trust.

In order to realize the tax benefits of the QPRT, the grantor must outlive the term of the trust.  If the grantor dies before the trust term expires, the value of the property at the date of death will be included in the grantor's estate and be subject to estate taxes.  If the grantor outlives the term of the trust, the property passes to the beneficiary, in this case the Yerushalmi Family Trust, at the end of the term.  At that point, the grantor may lease the residence back from the beneficiary at fair market rent, thereby allowing the grantor to continue living in the house.

In this case the term of the QPRT is 23 years.  It does not expire until 2018.

According to the Debtor, in furtherance of the plan to transfer the Great Neck Residence

---

[3]     The Debtor and Malka maintain that the Yerushalmi Family Trust and QPRT were formed in order to provide for the long term needs of their youngest child.  The Trustee disputes this was their motivation.  The Court finds that it is irrelevant whether they were providing for the "long term needs" of their child(ren), or simply just trying to gain a tax advantage for them.  It was an estate planning tool at its inception, and the Trustee has presented no evidence that would prove the Debtor caused the QPRT to be created to improperly avoid financial obligations.  *See* Kushner Decl., Exh. 18 [Dkt #83-14].

to the QPRT, the Debtor transferred his 50% ownership interest in the Great Neck Residence to Malka by deed dated March 28, 1996.[4]

On May 9, 1996, Malka, as grantor, transferred her 100% interest in the Great Neck Residence to the QPRT.  The QPRT holds no assets other than the Great Neck Residence, and it continues to hold legal title to the property.

*The Accounting Action*

The Debtor is an attorney.  Beginning in June 1987, he practiced law with Mr. Amnon Shiboleth at the law firm Yerushalmi, Shiboleth, Yisraeli and Roberts, LLP ("YSYR").  The partnership dissolved sometime in 1995, and in April 1997 the Debtor started practicing law under the name Yerushalmi & Associates, LLP ("Y&A").  Shiboleth practiced law under the name Shiboleth, Yisraeli, Roberts and Zisman, LLP.

In January 1998, Shiboleth commenced a partnership accounting action against Y&A and the Debtor individually ("Accounting Action").  In March 2007, a judgment of $3.45 million was entered in favor of YSYR and Shiboleth, against Y&A and the Debtor.  Both Y&A and the Debtor appealed the judgment, and the appeal was pending as of the bankruptcy petition date.[5] On January 6, 2009, subsequent to the bankruptcy filing, the Appellate Division vacated the

---

[4]    According to the Debtor, because Malka was younger and had a longer life expectancy, they would gain a greater tax advantage if she was the sole grantor of the QPRT. Whatever the motivation for the transfer to Malka, this transfer and the subsequent transfer to the QPRT fall outside of the reach back period for fraudulent conveyances and cannot be avoided on that basis. *See* 11 U.S.C. §544(b) (2012) (incorporating state fraudulent conveyance laws); N.Y. Debt. & Cred. Law §§ 270-281 (McKinney 2012) (fraudulent conveyance statutes); N.Y. C.P.L.R. 213 (McKinney 2012) (six-year reach back).

[5]    The Debtor continued with the appeal after it was abandoned by the Trustee.

damages awarded in favor of Shiboleth and YSYR and remanded back to a special referee to

recalculate the allocation of certain contingency fees among the parties.  On November 17, 2011,

the state trial court issued an opinion pursuant to which the allocation of fees among the parties

resulted in a net judgment in favor of the Debtor and Y&A in the approximate amount of

$600,000.  (Debtor's Reply, Exh. A [Dkt #102-2]).


*The Divorce Action*

In April 2002, Malka commenced a divorce action.  Despite their estrangement, the

Debtor and Malka continued to reside at the Great Neck Residence.  In the course of the divorce

proceedings, in November 2003, the state court directed the Debtor to pay all of the carrying

charges on the Great Neck Residence, "including, but not limited to, mortgage, taxes, utilities,

insurance, landscaping and all maintenance expenses... ." (Kushner Decl., Exh. 39 [Dkt #83-42]).


*The Bankruptcy Filing and Procedural History*

On July 25, 2007, the Debtor filed separate chapter 11 bankruptcy petitions for himself

and his law firm, Y&A [Case No. 07-72817-dte].  Both his individual case and the Y&A case

were converted to chapter 7 on October 2, 2007.  Marc A. Pergament, the Plaintiff herein, was

appointed chapter 7 trustee ("Trustee") of the Debtor's individual case.  According to the

Trustee, on the date of the petition the Great Neck Residence was worth approximately $5.2

million and the outstanding balance on the Citibank mortgage was $407,000.

On January 5, 2009, the Trustee filed the instant adversary proceeding against Malka

Yerushalmi, individually, and Joseph Yerushalmi and Malka Yerushalmi in their capacities as trustees of the QPRT.  In the complaint as originally filed, the Trustee sought to avoid the Debtor's transfer of his interest in the Great Neck Residence to Malka in March of 1996, and Malka's subsequent transfer of her 100% interest in the Great Neck Residence to the QPRT in May of 1996, as fraudulent conveyances (the "Property Transfers").  He also sought to recover from Malka and the Debtor as Trustees of the QPRT, the real property expenses that were paid by the Debtor from 1996 until the bankruptcy petition date (the "Expense Transfers").

On March 6, 2009, the Debtor moved to dismiss the adversary proceeding.  The Debtor argued, among other things, that the claims to recover the Property Transfers were time barred because they occurred more than six years prior to the bankruptcy filing.  The Debtor sought to dismiss the claims to avoid the Expense Transfers because a bulk of the Expense Transfers took place outside of the six year reach back period, and, he argued, even those transfers that were made within the reach back period were made for fair consideration.

The Trustee opposed the motion to dismiss, but he also filed a motion to amend the complaint.  In the motion to amend the complaint, the Trustee withdrew the fraudulent conveyance claims with respect to the Property Transfers, and sought to modify the claims for relief with respect to the recovery of the Expense Transfers.[6]  Finally, the Trustee sought to add a claim under Bankruptcy Code sections 541 and 542 for a declaratory judgment that the QPRT is the alter ego of the Debtor and the assets of the QPRT, or the value thereof, should "revert to the Estate" in their entirety.  The Trustee seeks damages in the sum of $2.5 million on this claim,

---

[6]   The amended complaint added Citibank, N.A. as a defendant with respect to recovery of the Expense Transfers.  When the Trustee subsequently withdrew the Expense Transfer claims, the claims against Citibank were thus withdrawn.  *See infra*.

which represents what he asserts is the Debtor's 50% interest in the Great Neck Residence.

The Debtor opposed the Trustee's motion to amend the complaint and argued, in part, that the Trustee's alter ego claim should not be added to the complaint because the claim was time-barred and the Trustee lacked standing to pursue the claim.

On September 14, 2009, Judge Eisenberg issued a Memorandum Decision and Order granting the Trustee's motion to amend the complaint, and denying the Debtor's motion to dismiss.[7]  An Amended Complaint was filed on October 27, 2009, and answers were subsequently filed by the Defendants.

On October 13, 2011, the Defendants filed the instant motions for summary judgment seeking dismissal of the amended complaint as a matter of law.  In his opposition to the motions, the Trustee withdrew his claims to recover the Expense Transfers.  As a result, the only claim remaining in this lawsuit is the Trustee's claim seeking a declaratory judgment pursuant to sections 541 and 542 that the QPRT is the alter ego of the Debtor.

A hearing on the motions was held on January 23, 2012 at which time the Court took this matter under submission.

---

[7]    The Debtor filed a notice of appeal of the September 14, 2009 Decision, and a related motion for leave to appeal.  The motion for leave to appeal was denied by Order of the District Court, dated November 15, 2011, and the appeal was terminated.

## Discussion

*Standing*

By all accounts, the only claim remaining in this case is the Trustee's "alter ego"[8] claim asserted under sections 541 and 542 of the Bankruptcy Code. Specifically, in connection with this claim the Trustee alleges that:

•     the Debtor "controlled and dominated all aspects of the QPRT" since its creation;
•     the real property owned by the QPRT was purchased with the Debtor's own funds;
•     the QPRT never established its own checking account;
•     the QPRT did not maintain books and records;
•     the Debtor's wife, "Malka acted at all times as the nominee of the Debtor with respect to the QPRT";
•     "the Debtor used his control of the [QPRT] to conceal his assets and to engage in fraudulent conveyances to shield funds from the reach of his creditors";

Based upon those allegations, the Trustee seeks judgment pursuant to sections 541 and 542 of the Bankruptcy Code "piercing" the QPRT and declaring that the QPRT is the alter ego of the Debtor "and that the assets of the [QPRT] revert to the Estate or, in the alternative, awarding the Plaintiff damages in the sum of at least $2,500,000.00, plus interest." Amended Complaint ¶¶ 62- 69.

In support of dismissal of the alter ego claim, the Defendants argue that a bankruptcy trustee's standing to pursue an alter ego claim derives solely from section 544, not 541 and 542. They argue that the alter ego claim is improperly pled under section 541 because under that section the Trustee can only pursue claims that the Debtor could have pursued prior to the

---

[8]     Although the Court refers to this claim as an "alter ego" claim, the allegations of the Amended Complaint reflect that the Trustee refers to this claim as both alter ego and piercing. There is a distinction between the two theories, which will be discussed later in this Memorandum Decision.

petition date.  The Defendants cite to New York state case law for the proposition that a corporation cannot pierce its own veil.  Therefore, since the Debtor could not seek to pierce the trust "veil" pre-petition, the Trustee cannot seek to pierce the veil post-petition.  Even if the Trustee had pled the cause of action under section 544, which he did not, the Defendants argue that the Trustee in this case cannot prove the existence of an unsecured creditor that was harmed by the transfer of the Great Neck Residence to the QPRT.

The Trustee does not claim to derive his standing from an aggrieved creditor under section 544.  He argues that he clearly has standing to pursue this claim because it falls within the discharge of his duties under section 704(a) of the Bankruptcy Code; that is, he is seeking to establish that the Great Neck Residence - legal title to which is held by the QPRT – is property of the estate which should be turned over to the estate for the benefit of all creditors.

Standing is a jurisdictional issue under Article III of the Constitution which must be addressed as a threshold matter.  *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 119 (2d Cir. 1991).  Under Article III of the Constitution there must be a case or controversy to invoke a federal court's jurisdiction, which requires among other things that the party invoking the power of the court has a personal stake in the outcome of the case or controversy.  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).  As such, the legal rights asserted by the plaintiff must be his or her own.  *Warth v. Seldin*,  422 U.S. 490, 499 (1975); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (Bankr. S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003); *Wight*, 219 F.3d at 91; *see also Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 428 (1972).

In addition to Constitutional limits on standing, there are also prudential limits which "are

'judicially self-imposed limits on the exercise of federal jurisdiction,' ... and exist to preserve 'the proper—and properly limited—role of courts in a democratic society.' " *McHale v. Citibank, N.A. (In re 1031 Tax Group, LLC)*, 420 B.R. 178, 192 (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 91 (2d Cir. 2009) and *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (other citations omitted)).  In *Shearson Lehmann Hutton, Inc. v. Wagoner*, the Second Circuit imposed prudential limits on a bankruptcy trustee's standing to sue third parties when his standing to sue derives from the debtor, as opposed to creditors. *Wagoner*, 944 F.2d at 118.  In *Wagoner*, the Second Circuit held that " . . . the 'case or controversy' requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee; that is, if a trustee has no power to assert a claim because it is not one *belonging to the bankrupt estate*, then he also fails to meet the prudential limitation that the legal rights asserted must be his own." *Id.* (emphasis added).  The court established that a bankruptcy trustee generally has no standing to sue third parties on behalf of the estate's creditors, "but may only assert claims held by the bankrupt corporation itself." *Id.* (citing *Caplin*, 406 U.S. at 434).

The Second Circuit has specifically addressed a bankruptcy trustee's standing to assert an alter ego claim.  In *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.* 884 F.2d 688 (2d Cir. 1989), the court held that (a) if the alter ego claim could have been asserted by the Debtor pre-petition, *and* (b) if the claim does not involve a direct injury to a particular creditor, then the bankruptcy trustee is the proper party to assert the alter ego claim and all other creditors are stayed by section 362.  *See id.* at 704-05.  In the *St. Paul* case, the court was faced with the potential for conflicting lawsuits inside and outside of bankruptcy, by a bankruptcy trustee and a creditor, respectively. The court reasoned that if the claims asserted by the creditor outside of bankruptcy were property

of the debtor under state law, and if the creditor had not alleged a direct injury to it, then the

creditor's claim was precluded by the bankruptcy trustee's right to pursue the claim on behalf of

the estate.  Citing to the legislative history of the Bankruptcy Code, the court reasoned that:

> It is plain . . . Congress intended to protect all creditors by making the trustee the
> proper person to assert claims against the debtor.  This reasoning extends to
> common claims against the debtor's alter ego or others who have misused the
> debtor's property in some fashion.  If a claim is a general one, with no
> particularized injury arising from it, and if that claim could be brought by any
> creditor of the debtor, the trustee is the person to assert the claim, and the
> creditors are bound by the outcome of the trustee's actions.

*Id.* at 701.

In the *St. Paul* case, the Second Circuit found that the Debtor could have asserted an alter

ego claim under Ohio law prior to the filing of the bankruptcy, and that the alter ego claim

alleged a generalized injury to creditors, and therefore held that the claim in that case was

properly asserted by the bankruptcy trustee alone.  Although the *St. Paul* decision was decided

under Ohio law, the District Court for the Southern District of New York subsequently found that

New York law also permits a "trustee [to] bring an alter ego cause of action on behalf of a

corporate debtor in an attempt to collect property of the estate for the benefit of all creditors if

such an action is not personal to any particular creditor."  *Mediators, Inc. v. Manney (In re

Mediators, Inc.)*, No. 91 B 12980 (PBA), Adv. No. 93 CIV. 2304 (SDH), 1996 WL 297086

(S.D.N.Y. June 4, 1996).  The Court in that case focused its analysis upon whether the injury

alleged in the alter ego complaint was a direct (i.e., specific) injury to a particular creditor, or an

indirect (i.e., general) injury common to all creditors of the debtor.

This Court agrees with the *Mediators* court's assessment of New York alter ego law and

finds that the Debtor in this case could have asserted an alter ego claim against the QPRT prior to

filing bankruptcy.  There is sufficient authority to support this conclusion in the corporate

context, and as is discussed later in this Memorandum Decision, this Court will assume without

deciding, that the piercing theory can also be applied to trusts.  Thus, the first part of the *St. Paul*

analysis is satisfied in this case.  *See Rochester Gas & Electric Corp v. GPU, Inc.*, No. 09-0482-

CV, 2009 WL 4673916 (2d Cir. Dec. 10, 2009) (corporation can pierce its own veil); *Musico v.*

*Champion Credit Corp.*, 764 F.2d 102, 108 (2d Cir. 1985) (citing *In re Weinstein*, 269 N.Y.S.2d

475, 476 (N.Y. App. Div. 2d 1966), *appeal dismissed*, 224 N.E.2d 883 (N.Y. 1967) (finding that

blanket statement that a corporation can never pierce its own veil is not accurate); *Jackson v.*

*Corporategear LLC*, No. 04 Civ. 10132 (DC), 2005 WL 3527148 (S.D.N.Y. Dec. 21, 2005)

("Under New York law, a corporation may pierce its own corporate veil."); *Gosconcert v.*

*Hillyer*, 158 B.R. 24 (S.D.N.Y. 1993) (finding trustee, not creditor is the proper party to assert a

generalized claim, such as alter ego, on behalf of all creditors); *Green v. Bate Records, Inc. (10th*

*Ave. Record Distribs., Inc.)*, 97 B.R. 163, 165 (S.D.N.Y. 1989) ("Since the trustee's alter ego

cause of action here is without doubt an attempt to collect property of the estate for the benefit of

*all* creditors and is not personal to any particular creditors, it may be maintained by the

bankruptcy trustee); *Corcoran v. Hall & Co.,* 545 N.Y.S.2d 278 (N.Y. App. Div. 1st 1989)

("While the defendants assert that a corporation may never pierce its own veil in this State ... ,

there is an obvious difference between an 'alter ego' action brought by a liquidator or receiver for

a defunct corporation and that brought by an operating corporation."). *But see Goldman v.*

*Haverstraw Assocs. (In re R.H.N. Realty Corp.)*, 84 B.R. 356 (Bankr. S.D.N.Y. 1988) ("The

corporate veil is never pierced for the benefit of the corporate debtor . . .  A Chapter 7 trustee

simply does not have standing to bring an alter ego cause of action on behalf of the debtor's

creditors.") (citation omitted).

Part two of the *St. Paul* analysis of a bankruptcy trustee's standing to pursue an alter

claim is also satisfied. The Trustee is asserting a generalized injury to all creditors and is seeking

to recover property – which is allegedly property of the estate – for the benefit of all creditors.

He bases his standing on sections 541, 542 and 704, not section 544. His standing in this case

does not derive from an injury to any one particular creditor – a fact which is now underscored

by the effective reversal of the Shiboleth judgment against the Debtor.

Therefore, based on the Second Circuit's holding in *St. Paul*, the Court finds that the

Trustee has standing to assert the alter ego claim.[9] *Accord In re Steyr-Daimler-Puch of America*

*Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir. 1988); *Koch Refining v. Farmers Union Cent.*

*Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987), *cert. denied*, 485 U.S. 906 (1988); *S.I.*

*Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142,

---

[9]    Because the Trustee has alleged fraud in connection with the alter ego claim the Court initially was concerned that this case might invoke the prudential limitations on standing established in this Circuit by *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d at 119. However, the nature of an alter ego claim brings the instant case outside of the so-called *Wagoner* rule. Aside from the rule of imputation, which is not present in the case of an individual debtor, the *Wagoner* case simply stated that a trustee does not have standing to pursue creditor claims which are not specifically given to the trustee under the Bankruptcy Code. The District Court in *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, No. 91 B 12980 (PBA), Adv. No. 93 CIV. 2304 (SDH), 1996 WL 297086 (S.D.N.Y. June 4, 1996), distinguished *Wagoner* in the context of alter ego claims as follows: "An action to pierce the corporate veil generally belongs to a corporation's creditors. When a corporation is in bankruptcy, however, the automatic stay provisions of the Bankruptcy Code often preclude creditors from asserting such a claim. Thus, the legal representative of the estate has standing to assert that claim in the name of the debtor and for the benefit of its creditors, where, as here, state law permits it and the claim is not particular to any one creditor." *Mediators*, 1996 WL 297086 at *11. *But see Titan Real Estate Ventures, LLC v. M.J.C.C. Realty L.P. (In re Flanagan)*, 373 B.R. 216 (Bankr. D. Conn. 2007), *aff'd*, 415 B.R. 29 (2009) (dismissing reverse veil piercing claim for lack of standing on *in pari delicto* grounds).

1152 (5th Cir. 1987).  *But see Williams v. Cal. 1ˢᵗ Bank (In re Chaklan Enters, Inc.)*, 859 F.2d

664, 667 (9th Cir. 1988) (bankruptcy trustee has no standing to assert a general cause of action,

such as an alter ego claim, on behalf of creditors); *Mixon v. Anderson (In re Ozark Rest. Equip.*

*Co., Inc.)*, 816 F.2d 1222, 1228 (8th Cir.), *cert. denied, Jacoway v. Anderson*, 484 U.S. 848

(1987) (same).


*Statute of limitations*

The Defendants also move for summary judgment on the basis that the Trustee's alter ego

claims are barred by the six-year statute of limitations for fraud under New York law.  The

Trustee argues that his alter ego claim is not time barred because a section 542 turnover action is

not subject to any statute of limitations or reach back period.

The Court agrees with the Trustee that there is no statute of limitations or reach back

period imposed on a trustee's cause of action to recover property of the estate under section 542

of the Bankruptcy Code.  *See, e.g.*, *In re Mushroom Transp., Co.,* 382 F.3d 325, 336-37 (3d Cir.

2004).  However, the answer to the statute of limitations issue is not so simplistic and the Court

must examine the nature of the Trustee's claim under section 541 to fully answer this question.

The Trustee has *not* sued the Defendants for fraud.  Nor is the Trustee seeking to enforce a

judgment or hold the QPRT liable for the obligations of the Debtor.  The Trustee's action is

equitable in nature.  He seeks a declaratory judgment that the QPRT is the alter ego of the

Debtor.  The consequence of such a determination would be that the Trustee is entitled to

demand turnover of the assets held by the QPRT because those assets are property of the estate

under section 541.  The Court finds that thus framed, the Trustee's alter ego claim is subject to

neither the six-year statute of limitations for fraud under New York law, nor the 20-year statute of limitations to enforce a judgment.  The facts of this case  – that is a bankruptcy trustee seeking to recover estate assets on an alter ego theory – are distinguishable from non-bankruptcy alter ego cases pursued by and for the benefit of individual creditors seeking to hold an alter ego liable for the obligations of another.

*Summary judgment standard*

Having found the Trustee has standing to pursue the alter ego claim and the claim is not barred by statute of limitations, we now analyze whether the relief he seeks should be denied as a matter of law.  The Defendants have moved to dismiss the alter ego claim pursuant to Rule 56 of the Federal Rules of Civil Procedure[10] which states, in pertinent part, that a moving party shall be granted summary judgment, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Accordingly, in ruling upon a summary judgment motion the Court is to determine whether a genuine issue of fact exists, not to resolve disputed issues of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  The court must resolve all ambiguities and draw reasonable inferences in favor of the nonmoving party.  *Thornton v. Syracuse Sav. Bank*, 961 F.2d 1042 (2d Cir. 1992); *Levin v. Analysis & Tech., Inc.*, 960 F.2d 314 (2d Cir. 1992). Factual allegations backed by affidavits or other evidence made by the party opposing the motion

---

[10]     Rule 56 governs the motion for summary judgment in this adversary proceeding by virtue of Fed. R. Bankr. P. 7056.

must be regarded as true and viewed in the light most favorable to the non-movant.  *Cartier v. Lussier*, 955 F.2d 841 (2d Cir. 1992).  If the movant is entitled to judgment as a matter of law even when all facts as alleged by the non-movant are regarded as true, then factual disputes which exist are not material and their presence will not preclude summary relief.  *Id.*

The Court finds, as discussed below, the alleged factual issues raised by the Trustee are immaterial to resolution of this matter on the merits and this case is ripe for summary judgment.

*Merits of the alter ego claim*

The Defendants argue that the elements of alter ego are not satisfied here because the QPRT was formed for legitimate estate planning purposes and was never used as a vehicle to conceal assets from creditors.  The Trustee asserts that "following the formation of the QPRT, the Debtor used the QPRT as his own personal vehicle to shield his assets from creditors." (Trustee's Memo of Law in Opposition at 2 [Dkt # 99]).  The Trustee alleges that the QPRT is the "mere instrumentality" of the Debtor and the trust should be pierced so that its sole asset, the Great Neck Residence, can be sold and the net proceeds distributed to the Debtor's unsecured creditors.

By his own admission, the "best evidence" in support of the Trustee's theory is a statement made by the Debtor in connection with the Accounting Action.  (Trustee's Decl., Exh. G [Dkt #97-8]).  In that action, in opposition to a motion to appoint a receiver over his assets, the Debtor signed an affidavit stating that he owned real estate in New York worth in excess of $5 million, encumbered by less than $700,000 in mortgages.  The Debtor denies that he was claiming ownership of the Great Neck Residence when he made that statement, but the Trustee

points to a personal financial statement which he believes confirms that the Great Neck

Residence made up "the bulk of" the $5 million in real estate referred to in the Debtor's state

court affidavit. (Trustee's Decl., Exh. J [Dkt #97-11]).

In addition to the Debtor's state court affidavit, the Trustee argues that the QPRT should

be pierced because the Debtor exercised "complete dominion and control" over the QPRT since

its inception. The Trustee argues that the Debtor made all financial decisions for the QPRT and

it was only the Debtor's funds that were used to pay expenses of the Great Neck Residence. He

also argues that no trust formalities were followed and his ex-wife, as grantor of the QPRT, was

unaware of her obligations as grantor.

First, the Court will examine whether a validly-formed estate planning trust can ever be

"pierced." The Second Circuit addressed this issue in *Citibank N.A. et al. v. Vebeliunas (In re*

*Vebeliunas)*, 332 F.3d 85 (2d Cir. 2003), but did not conclusively decide it. The circuit court

noted that the New York Court of Appeals has not decided as a matter of state law whether a

validly formed estate planning trust may be pierced. However, the circuit court observed that the

lower state court cases cited in support of the right to pierce a trust all involved the concealment

of assets or fraudulent conveyances. *See Posner v. S. Paul Posner 1976 Irrevocable Family*

*Trust*, 688 N.Y.S.2d 548 (N.Y. App. Div. 1st 1999); *Goldberg v. Goldberg*, 568 N.Y.S.2d 394

(N.Y. App. Div. 1st 1991); *Pappas v. Freund*, 660 N.Y.S.2d 302 (Sup. Ct. 1997); *see also Nat'l*

*Union Fore Ins. Co. v. Eagle Equip. Trust*, N.Y.S.2d 308 (N.Y. App. Div. 1st 1995) ("There is

no authority for applying, by analogy, a theory of 'piercing the corporate veil' to disregard the

form of a trust, when the trust was not formed for an illegal purpose and there is the requisite

separation between beneficiary and trustee."). Despite this observation, ultimately the Second

Circuit found that it did not need to decide the issue because even assuming a trust could be pierced, the elements of piercing had not been established on the facts of that case.

The Court finds that the weight of the caselaw in the state of New York supports a ruling that estate planning trusts generally are susceptible to attack if used for a fraudulent purpose. However, as in *Vebeliunas*, the Court finds that the facts of this case do not rise to the level necessary to "pierce" the veil of the QPRT.

Under prevailing New York law, in order to pierce the veil of a corporation, a plaintiff must show that: "(1) the owner exercised complete domination of the corporation with respect to the transaction at issue; and (2) the owner used this domination to commit a fraud or wrong against the plaintiff which resulted in injury to the plaintiff." *Morris v. N.Y. State Dep't of Taxation & Fin.*, 623 N.E.2d 1157 (N.Y. 1993). The first prong of this standard sets forth the standard to find one entity the alter ego of another.[11] This combined with the second prong, i.e.,

---

[11]    The Second Circuit has enumerated a non-exhaustive list of factors relevant to determining whether a corporation has been "dominated" by its owners:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of the corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporation as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

fraud or wrong doing, is what justifies disregarding the corporate form to hold one entity liable for the obligations of another.   Actual or common law fraud need not be proven.   *See DER Travel Servs. v. Dream Tours & Adventures*, No. 99-2231, 2005 WL 2848939, at *9 (S.D.N.Y. Oct. 28, 2005).   Although this standard references a "transaction", and injury to a "plaintiff", the standard has also been applied, by analogy, to the situation where a bankruptcy trustee is asserting a claim on the debtor's behalf alleging a generalized injury to creditors.   *See Mediators*, 1996 WL 297086.   The Second Circuit has found that this piercing standard applies, by analogy, to trusts.   *See In re Vebeliunas*, 332 F.3d 85, 90-91 (2d Cir. 2003); *see also U.S. v. Evseroff*, No. 00-CV-06029 (KAM), 2012 WL 1514860 at *13-14 (E.D.N.Y. Apr. 30, 2012).

The Trustee cites to *In re Bellardita*, No. 05-60471-A-7, 2008 WL 4296554 (Bankr. E.D. Cal. Sept. 19, 2008), in support of his piercing claim.   In *Bellardita*, the debtor purchased three parcels of real property in her own name and shortly thereafter transferred those properties to an entity under her control, Vita Bella Group Homes ("Vita Bella") for no consideration.   A year later, Vita Bella transferred those properties back to the debtor, individually, for no consideration.   Three years after that, the debtor transferred the properties back to Vita Bella and Vita Bella then transferred the properties to a family trust, of which the debtor was a trustee.   At the time of these transfers, the court found that the debtor's liabilities far exceeded her assets, and there was litigation pending against the debtor and her largest creditor had already been awarded a judgment against her.   The debtor claimed she made the transfers on the advice of counsel, but the court found this claim to be incredible.   The properties consisted of all or substantially all of the debtor's assets. There was further evidence in the case that the debtor held herself out as the owner of the property to a mortgage lender despite the ownership of the property by the family

trust.  In *Bellardita*, the court not only found the family trust to be an alter ego of the debtor but also avoided the property transfers as fraudulent conveyances.

The Trustee also cites to *In re Maghazeh*, 310 B.R. 5 (Bankr. E.D.N.Y. 2004).  In that case the court found it appropriate to pierce the veil of an estate planning trust where the debtor treated the trust "as his own personal vehicle to shield his assets from his creditors and to perpetrate a fraud . . . " *Id.* at 18; *see also In re Gillespie*, 269 B.R. 383 (Bankr. E.D. Ark. 2001) (trust veil pierced where debtor engaged in wrongdoing).

The facts of the case at bar are clearly distinguishable from *Bellardita* and *Maghazeh.* The facts of this case do not show that this Debtor exercised complete domination over the trust, or even if he did, that he used that domination to commit a fraud or wrong.

The Debtor caused the QPRT to be formed in 1995 and the Great Neck Residence was transferred into the QPRT in 1996 at a time when the Debtor had significant assets and disposable income.  (Kushner Decl., Exhs. 28 - 32 [Dkt #83]; Trustee's Decl., Ex. J [Dkt #97-11].  Although the Debtor's law partnership dissolved in 1995, the Trustee acknowledges that the Accounting Action was not commenced until 1998 – two years after the Great Neck Residence was transferred into the QPRT.  The Trustee has not presented the Court with evidence of any litigation or threatened litigation which may have prompted the Debtor to improperly shield his assets from creditors at the time the QPRT was formed.  The only property ever transferred to the QPRT was the Great Neck Residence, and the QPRT continues to hold legal title to the Great Neck Residence pursuant to the terms of the trust document.  The Trustee does not dispute these facts.

The Trustee concedes that the correct analysis is not of the circumstances surrounding the

transfer to the QPRT, but rather the Debtor's conduct subsequent to the formation of the trust. The Trustee's best evidence to support his alter ego theory is that the Debtor allegedly claimed ownership of the Great Neck Residence in connection with Shiboleth's state court efforts to appoint a receiver in the Accounting Action. The Debtor disputes that he claimed ownership of the Great Neck Residence, but rather was referring to some other real property when he filed that statement. Despite this dispute, the Court does not find that this is a material fact. The Debtor claimed an ownership interest in unspecified real property worth $5 million encumbered by $700,000. Even assuming the Debtor was including the Great Neck Residence in this estimation it does not mean that the Debtor in fact *owned* the Great Neck Residence, nor does it prove that the Debtor completely dominated and controlled the QPRT.[12] Without more, this statement is insufficient to declare the QPRT an alter ego of the Debtor. The cases which have pierced the trust veil have done so on much more egregious facts than these.

While it is true the Debtor retained the use and enjoyment of the Great Neck Residence after it was transferred to the QPRT and continued to pay all expenses associated with the Great Neck Residence, those facts are consistent with the requirements of a valid QPRT. The grantor of a qualified personal residence trust retains the right to live at the residence rent free but has to pay all costs associated with the residence for the duration of the trust term– in this case until

---

[12]    This Court declines to comment on whether the Debtor perjured himself when he swore to the facts contained in that state court affidavit. The Court also is not persuaded that judicial estoppel applies under these circumstances. *Intellevision v. Microsoft Corp.*, No. 11-1657-CV, 2012 WL 2086297 at *2 (2d Cir. June 11, 2012) ("in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is 'clearly inconsistent' with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"), citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

2018.  In this case the grantor was Malka, but it is consistent with the marital relationship that the

Debtor also continued to occupy the premises and pay associated expenses as he was and

continues to be the sole financial provider for the family.  *See Vebeliunas*, 332 F.3d 85, 92 (2d

Cir. 2003) (it is entirely consistent with the marital relationship that the benefits of real property

should flow jointly to an owner and their spouse).  The Debtor's continued payment of expenses

related to the Great Neck Residence is also consistent with the matrimonial court order which

required him to do so.

     The Debtor did not pledge the Great Neck Residence as collateral for his personal

obligations.  Nor did he hold himself out as the owner of the property in order to mortgage the

residence for his own benefit.  The only transaction conducted by QPRT since its inception was

to refinance the mortgage at a lower rate.  There is documentary evidence showing that the

Debtor did not have the power to effectuate the refinance of the mortgage on the Great Neck

Residence without Malka's consent, and the Debtor recognized that limitation on his authority.

(Kushner Decl., Exh. 34 [Dkt #83-37]).  In a December 19, 2002 letter from the Debtor to

Malka's attorney, the Debtor explained that he needed Malka's participation, as co-trustee of the

QPRT, in a refinance that would reduce the mortgage interest rate from 7% to 5.875%.  The

Debtor did not cause any equity to be taken out of the Great Neck Residence and there is nothing

else about this transactions that would suggest that the Debtor was holding himself out as the

"owner" of the property.

     Based on the undisputed facts, the Court finds the Debtor did not engage in any conduct

or enter into any transaction that would be inconsistent with the QPRT's ownership of the

property, and the Trustee has failed to prove that the Debtor exercised complete domination over

the trust, or even if he did, that he used that domination to commit a fraud or wrong.

### Conclusion

For all of the foregoing reasons, the Defendants' motions for summary judgment are granted and judgment will enter in favor of the Defendants on the first claim for relief of the Amended Complaint, which is the sole remaining claim for relief in this case.

Dated: Central Islip, New York
      November 19, 2012               **/s/ Robert E. Grossman**
                                       Robert E. Grossman
                                       United States Bankruptcy Judge